# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEVIN BROWN, STEVEN LAMB, and CHRIS BERTRAND, | ) ) ) | |
| Plaintiffs/Counterclaim Defendants, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2021-0262-KSJM |
| COURT SQUARE CAPITAL MANAGEMENT, L.P., COURT SQUARE CAPITAL GP, LLC, and COURT SQUARE CAPITAL GP III, LLC, | ) ) ) ) ) ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: October 27, 2023
Date Decided: December 15, 2023

Patricia L. Enerio, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Jacob W. Buchdahl, Shawn J. Rabin, Raj Mathur, SUSMAN GODFREY L.L.P, New York, New York; *Counsel for Plaintiff and Counterclaim Defendant Kevin Brown.*

P. Clarkson Collins, Jr., K. Tyler O'Connell, Samuel E. Bashman, MORRIS JAMES LLP, Wilmington, Delaware; Steven B. Feirson, Alan D. Berkowitz, J. Ian Downes, DECHERT LLP, Philadelphia, Pennsylvania; *Counsel for Defendants and Counterclaim Plaintiffs Court Square Capital Management, L.P., Court Square Capital GP, LLC, Court Square Capital GP III, LLC.*

**McCORMICK, C.**

Plaintiff Kevin Brown was a partner at Court Square Capital Management, L.P, and received carried interest in two of Court Square's funds during his tenure with the company. He resigned from Court Square in 2016 to join MSD Capital, and Court Square continued making carried interest payments to Brown for years after his resignation. Beginning in 2019, however, other employees left Court Square to join MSD. Court Square sent letters accusing Brown and the other former employees of breaching non-compete provisions in the LLC agreements that govern their rights to carried interest. The letter campaign escalated, Court Square ceased making carried interest payments, and the former employees brought this suit to enforce their rights under the LLC agreements. Court Square settled its claims against all the former employees except Brown, against whom Court Square asserted counterclaims for breach of non-compete and confidentiality provisions in the LLC agreements. This post-trial decision enters judgment for Brown on all claims and counterclaims.

## I.  FACTUAL BACKGROUND

Trial took place over two days. As reflected in the Joint Schedule of Evidence submitted by the parties, the record comprises 527 joint trial exhibits, trial testimony from five fact witnesses, deposition testimony from two additional fact witnesses and one expert witness, and 33 stipulations of fact in the amended pre-trial order.[1] These are the facts as the court finds them after trial.

---

[1] C.A. No. 2021-0262-KSJM, Docket ("Dkt.") 182, Joint Schedule of Evid.; Dkt. 161, Amended Pre-Trial Stipulation and Order ("Am. PTO"). This decision also cites to: trial exhibits (by "JX" number); the trial transcript, Dkts. 168–69 (by "Trial Tr. at" page, line, and witness); the post-trial oral argument, Dkt. 181 (by "Post-Trial Oral Arg. Tr. at" page, line, and witness); and the deposition transcripts of Kevin Brown,

### A. Court Square And Brown

Court Square is a middle-market private equity firm that was spun off from Citicorp Venture Capital in 2006.[2] Court Square manages ten-year funds.[3] The funds invest their assets over a five-year period and then "harvest" those investments during the succeeding five years.[4] The typical size of an investment for Court Square is between $150 million and $3 billion.[5]

Two of Court Square's funds—Court Square Capital GP, LLC ("Fund II") and Court Square Capital GP III, LLC ("Fund III")—are defendants in this case. Funds II and III each made approximately 20 investments.[6] Funds II and III are currently harvesting their investments.[7]

Court Square invests in four sectors, also called "verticals": business services, healthcare, technology, and industrials (a "grab bag of things that don't fit anywhere

---

Michael Delaney, Steven Lamb, Thomas McWilliams, Anthony Mirra, Charles Moore, and Joseph Silvestri (by the deponent's last name and "Dep. Tr. at" page and line).

[2] Trial Tr. at 56:3–5 (Bertrand); *id.* at 314:11–18 (Silvestri).

[3] *Id.* at 315:8–15 (Silvestri).

[4] *Id.* at 315:8–15 (Silvestri).

[5] *Id.* at 315:16–21 (Silvestri).

[6] *Id.* at 321:2–10 (Silvestri) (discussing Fund II); *id.* at 322:1–7 (Silvestri) (discussing Fund III).

[7] *Id.* at 321:6–10 (Silvestri) (discussing Fund II); *id.* at 322:1–7 (Silvestri) (discussing Fund III).

else[]" like manufacturing companies).[8]  Court Square personnel are assigned to one of four verticals.[9]

At Court Square, investment professionals above the entry-level associate position—vice presidents, principals, partners, and managing partners—receive a carried interest or "carry" in the funds.[10]  Carried interest is a "performance fee . . . paid based on the performance of the fund, i.e., how successful has the fund been."[11]

The board of managers of each fund determines the allotment of carried interest points.[12]  The process works as follows: once the profits come to the fund, they are placed in escrow and ultimately distributed.[13]  The amount each fund member receives from the distribution is based on the member's vesting status.[14]  A member is vested 20% each year and thus fully vested after five years.[15]

Brown worked in the industrials vertical as Vice President.[16]  Court Square promoted Brown twice: to principal in 2008, and to partner in 2012.[17]  Brown received

---

[8] McWilliams Dep. Tr. at 17:20–20:10, 22:5–11.

[9] *See* Trial Tr. at 319:9–320:1 (Silvestri).

[10] Delaney Dep. Tr. at 42:7–15.

[11] Mirra Dep. Tr. at 51:21–52:1.

[12] Trial Tr. at 323:8–10 (Silvestri).

[13] *Id.* at 323:11–22, 324:20–22 (Silvestri).

[14] *Id.* at 323:14–324:15 (Silvestri).

[15] *Id.* at 323:23–324:2 (Silvestri).

[16] *See id.* at 145:17–146:17 (Brown).

[17] Brown Dep. Tr. at 13:20–25, 14:8–17; Am. PTO ¶ 19.

excellent reviews during his tenure.[18]  Court Square awarded Brown carried interest in Funds II and III.[19]  At Court Square, Brown satisfied all contractual requirements to earn and retain his carried interest.[20]

On June 3, 2016, Brown left Court Square to join MSD,[21] the family investment office of Dell Technologies Founder, Chairman, and CEO Michael S. Dell.[22]  Because Brown resigned and was not terminated for cause,[23] absent breach of the LLC Agreements (discussed and defined below), he was entitled to receive payments on carried interest that had vested before he resigned.[24]

## B.     The Restrictive Covenants

Funds II and III are governed, respectively, by the "Fund II LLC Agreement" and the "Fund III LLC Agreement" (collectively the "LLC Agreements").[25]  The Fund III LLC Agreement governs most of the carried interest at issue in this case.[26]

---

[18] JX-501.

[19] Am. PTO ¶ 20.

[20] Trial Tr. at 394:6–11 (Silvestri).

[21] Am. PTO ¶ 27.

[22] *See* Lamb Dep. Tr. at 44:25–45:6.

[23] *See* Am. PTO ¶¶ 27–28; Trial Tr. at 325:15–22 (Silvestri); JX-2 ("Fund II LLC Agr.") § 5.7(c); JX-3 ("Fund III LLC Agr.") § 5.7(c).

[24] Trial Tr. at 325:15–22 (Silvestri); Fund II LLC Agr. § 5.8(a); Fund III LLC Agr. § 5.8(a).  The LLC Agreements specify that a member who resigns is still entitled to vested carried interest, but a member who is terminated for cause is not entitled to vested carried interest.  Fund II LLC Agr. § 5.8(a); Fund III LLC Agr. § 5.8(a).

[25] *See* Am. PTO ¶ 20.

[26] *See* Dkt. 171 ("Court Square's Post-Trial Opening Br.") at 64 & n.198 ("All of the payments that have been withheld by Court Square relate to Fund III, and there is no expectation of any future payments under Fund II." (citing JX-510; JX-445)).

4

The LLC Agreements contain non-compete provisions.[27] These provisions, however, do not ban former employees from working in private equity for a period or place them on garden leave. To the contrary, the LLC Agreements provide that "in no event shall this Section 5.14(a) be construed in of itself, as prohibiting a Member from . . . obtaining employment with, or investing in, a fund or any entity involved in similar activities as" Court Square.[28]

Rather than imposing a blanket non-compete restriction, the LLC Agreements contain "Non-Compete Provisions" prohibiting terminated employees, for a period of one year, from acquiring a direct or indirect interest in an entity defined as an "Investment Opportunity" and set out on a "Deal Sheet" prepared by Court Square at the time of the employee's departure.[29] The LLC Agreements deem someone to have acquired an interest in an Investment Opportunity if the terminated member "receives any form of direct or indirect fee, payment or other compensation based on the rendering of investment advice to a third party regarding such Investment Opportunity."[30]

---

[27] Fund II LLC Agr. §§ 5.14(a), (c); Fund III LLC Agr. §§ 5.14(a), (c).

[28] Fund II LLC Agr. § 5.14(a); Fund III LLC Agr. § 5.14(a) (same but referencing Section 5.14 entirely, not just Section 5.14(a)).

[29] Fund II LLC Agr. § 5.14(a); Fund III LLC Agr. § 5.14(a) (same but adding the Investment Opportunity must be "actively considered").

[30] Fund II LLC Agr. § 5.14(a); Fund III LLC Agr. § 5.14(a).

The LLC Agreements also contain nearly identical "Confidentiality Provisions" prohibiting current and terminated members from disclosing information related to Court Square that is "not generally known to or available for use by the public."[31]

The Non-Compete Provisions and Confidentiality Provisions are quoted more fully in the Legal Analysis.

## C.     The Deal Sheet And Challenged Deals

On June 10, 2016, Court Square emailed Brown a draft separation agreement.[32]   As contemplated by the LLC Agreements, on June 15, 2016, Court Square Managing Partner Joseph Silvestri emailed Brown a "Deal Sheet."[33] The Deal Sheet listed approximately 400 companies.[34] On a weekly basis, Court Square prepared a list of companies that it was actively considering.[35] The Deal Sheet was not limited to companies listed as actively considered on the weekly tracker.[36] The

---

[31] Fund II LLC Agr. § 1.6 (defining "Confidential Information"); Fund III LLC Agr. § 1.6 (same).

[32] JX-84.

[33] JX-86.

[34] *Id.*

[35] *See* McWilliams Dep. Tr. at 57:8–12; *see, e.g.*, JX-100, JX-157.

[36] *See, e.g., compare id.* at 8 (listing "Rinker Materials" on Brown's Deal Sheet), *with*, JX-56 at 1 (Dec 28, 2015 email stating, "we went 'pencils down' [on Rinker] a few weeks ago"); *compare* JX-86 at 7 (listing "Polynt" on Brown's Deal Sheet), *with*, JX-52 (Nov. 2, 2015 weekly deal sheet removing Polynt from pipeline), JX-76 (May 10, 2016 article stating Polynt was acquired by Black Diamond Capital Management, LLC and Investindustrial).

6

Deal Sheet included Zodiac Pool Systems, Inc. ("Zodiac") and Hayward Industries, Inc. ("Hayward").[37]

### 1. Zodiac

Brown developed an interest in pool manufacturers while at Court Square.[38] In the first half of 2016, Brown and employees at Court Square researched Zodiac, which they expected would go on the market later that year.[39] Zodiac's sale process kicked off in May, when Credit Suisse started to reach out to sponsors, and Brown and others at Court Square attended a presentation by Zodiac's management.[40]

After Brown left Court Square and joined MSD, Brown remained interested in the pool industry, so he participated in the first part of Zodiac's sale process.[41] MSD was not seriously interested in Zodiac, which already was owned by another private-equity firm; unlike Court Square, MSD focuses on acquiring family-led or family-owned businesses.[42] MSD witnesses credibly testified that MSD, like other private-equity firms, would sometimes participate in a sales process for companies MSD had no intention of acquiring to gain insight into an industry, and MSD was pursuing this strategy as to Zodiac.[43]

---

[37] Am. PTO ¶ 30; JX-86.

[38] Brown Dep. Tr. at 17:24–25, 45:15–23.

[39] Trial Tr. at 154:12–18 (Brown); *see* JX-74 at 1.

[40] JX-74 at 1; *see* JX-80.

[41] Am. PTO ¶ 32.

[42] *See* Trial Tr. at 185:14–187:23 (Brown).

[43] *See, e.g.*, Moore Dep. Tr. at 224:14–225:5 (testifying that "many firms . . . from time to time" "submit an indication of interest . . . to get more information in the second

7

Credit Suisse sent potential buyers a confidential information presentation in late June and set a deadline of July 19, 2016, to submit indications of interest.[44] Both Court Square and MSD analyzed Zodiac in the weeks that followed. Court Square submitted a nonbinding, preliminary bid to acquire Zodiac.[45] Court Square did not make it to the next round of bidding.[46] By July 26, 2016, Court Square had removed Zodiac from its weekly deal sheet.[47]

MSD did not bid by the July 19, 2016 deadline.[48] Brown did not know whether Court Square had bid on Zodiac.[49] He testified, however, that if Court Square was on the margin as a bidder, he did not want his "bid to somehow knock them out and interfere with their ability to pursue an investment in Zodiac."[50]

Credit Suisse asked to speak to Brown two days after the deadline.[51] During the conversation, Credit Suisse told Brown that Court Square was "not moving

round about the industry in general"); JX-106 at 6 (Court Square memo: "We intend to submit a bid for Polynt primarily to get a management meeting and use as a learning experience for our broader work on the composites industry, including the upcoming sale process for Ashland's composites business.").

[44] JX-99; JX-117.

[45] *See* JX-432, Defs.' Response to Pls.' Interrogatory 22.

[46] *Id.*; JX-124 at 1 (Court Square's Griffin Naylor to Deutsche Bank: "unfortunately we didn't make it to the next round on this one").

[47] *See* JX-123 at 1 ("Can you remove Zodiac [from] the deal sheet[.]").

[48] *See* Trial Tr. at 203:21–204:1 (Brown).

[49] *Id.* at 201:7–21 (Brown).

[50] *Id.* at 201:12–15 (Brown).

[51] JX-118.

8

forward in the process."[52] The next day, MSD submitted a nonbinding indication of interest in Zodiac.[53] MSD, however, declined Zodiac's invitation to a management presentation it was hosting in Los Angeles.[54] Neither Brown nor MSD acquired any interest in or received any compensation from Zodiac.[55]

### 2. Hayward

Hayward came on the market in early 2017, and both Court Square and MSD pursued the opportunity.[56]

Goldman Sachs led the process for Hayward. In late March 2017, Goldman set a deadline of April 13, 2017, for preliminary bids.[57] Court Square submitted an indication of interest to acquire Hayward for $1.7 billion.[58] MSD did not submit an indication of interest before the April 13 deadline.[59]

---

[52] Trial Tr. at 204:8–9 (Brown).

[53] JX-120 (Brown emailing Credit Suisse "our formal IOI for Zodiac" at 6pm on July 22, 2016); JX-116 (IOI dated July 19, 2016).

[54] *See* JX-127 at 2 (Brown discussing Zodiac: "They were not very accommodating in terms of scheduling the mgmt mtg and gave us a 'take or leave it' option so we chose the latter.").

[55] Am. PTO ¶ 33.

[56] *Id.* ¶¶ 34–35.

[57] JX-145 (process letter); *see also* JX-140 at 1 (March 21, 2017 email from Barclays noting "Hayward process has kicked off").

[58] Am. PTO ¶ 34; Trial Tr. at 80:1–4 (Bertrand).

[59] *See* Am. PTO ¶ 35.

On April 19, 2017, Court Square's Chris Bertrand received a call from Goldman stating it would need to increase its bid to proceed.[60] When Silvestri heard the news, he was asked by Silber whether Court Square was "out."[61] Silvestri responded "Yes[.]"[62] In this litigation, Court Square claimed that it intended to re-group and re-strategize as to Hayward after April 19, 2017, but that is not what Silvestri told Silber at the time. Rather, Silvestri stated that he did not "want to line up to compete" with the other bidders in the process.[63] Moreover, Silvestri cleared Silber to consult with other bidders. Silber asked: "[I]f I get a call from one of [the other bidders] to participate then you are Ok with that?"[64] Silvestri replied: "[N]o problem."[65] Court Square then deleted Hayward from its internal weekly deal sheet as of May 1, 2017.[66] These are not the actions of an entity that had a continued interest in the Hayward transaction.

On May 25, 2017, along with two other investors, MSD made a successful bid for Hayward.[67]

---

[60] *See* Trial Tr. at 119:18–120:4 (Bertrand); JX-156 at 2 (Apr. 19, 2017 email from Bertrand stating Goldman received higher bids).

[61] JX-156 at 1–2.

[62] *Id.*

[63] *Id.* at 1.

[64] *Id.*

[65] *Id.*

[66] JX-157 at 2 (Hayward Industries listed in "Pipeline Deletions").

[67] Am. PTO ¶ 35; JX-158.

Brown's non-compete with Court Square expired on June 3, 2017.[68] A few weeks later, on June 19, 2017, MSD publicly announced its acquisition of Hayward.[69] The press release identified Brown as leading the effort.[70]

After the press release came out, several Court Square employees congratulated Brown on the deal.[71]

The acquisition was not completed until August 2017.[72] Brown was awarded carried interest with respect to that investment after the acquisition closed, which was over a year after he left Court Square.[73]

### D.    The Heads-Up Memos

After leaving Court Square, Brown emailed his former Court Square associate, Bertrand, asking for documents called "heads-up memos" or "HUMs."[74] HUMs are one or two-page documents prepared by a Court Square investment professional to analyze potential investments.[75] Brown wanted old HUMs to "use as a template[.]"[76]

---

[68] Am. PTO ¶ 36.

[69] JX-165 (*CCMP Capital and MSD Partners, L.P. to Acquire Hayward Industries*, Business Wire (June 19, 2017)).

[70] *Id.*

[71] *See* JX-164 (Richard Walsh congratulating Brown); JX-163 (Bertrand congratulating Brown).

[72] *See* JX-167 at 2; Am. PTO ¶ 38.

[73] Am. PTO ¶ 38.

[74] Brown Dep. Tr. at 116:8–15.

[75] Trial Tr. at 93:1–16 (Bertrand).

[76] Brown Dep. Tr. at 116:8–15.

Brown testified that he did not ask for or expect to receive confidential information from Bertrand.[77]

Bertrand responded (using his personal email), providing Brown (on Brown's personal email) with seven HUMs.[78] Bertrand selected HUMs that Brown had co-authored and in which Brown had been "intimately involved," meaning that he was already aware of the substance of the memos.[79] Brown forwarded the HUMs to an associate at MSD.[80] Brown testified that he instructed the employee to use the HUMs to create a formatting template.[81]

None of the investment opportunities discussed in the HUMs were "actionable."[82] Each were either sold or Court Square had long since stopped considering the investment.[83] This was verified against Court Square's internal deal

---

[77] Trial Tr. at 191:22-192:7 (Brown).

[78] JX-106.

[79] *Id.* at 94:14–95:22 (Bertrand); *see* JX-106 (listing Brown as a co-author on all seven HUMs).

[80] JX-106.

[81] Trial Tr. at 194:7-11 (Brown).

[82] *Id.* at 95:4–22 (Bertrand).

[83] The HUMs were for seven companies: Rinker, InterWrap, Inc, Polynt Group, Distribution International, Inc, U.S. Pipe, PLZ Aeroscience, and Plaskolite. Six of the companies on the HUMs had been acquired. JX-16 (Dec. 15, 2014 article stating Distribution International, Inc. was acquired by Advent Intentional); JX-32 (July 31, 2015 article stating PLZ Aeroscience was acquired by Pritzker Group Private Capital); JX-53 (Nov. 6, 2015 article stating Plaskolite was acquired by Charlesbank Capital Partners); JX-65 (Feb. 24, 2016 article stating InterWrap was acquired by Owens Corning); JX-21 (Apr. 15, 2016 article stating U.S. Pipe was acquired by Forterra Building Products); JX-76 (May 10, 2016 article stating Polynt was acquired by Black Diamond Capital Management, LLC and Investindustrial). Court Square stopped considering Rinker Materials as an investment opportunity in late 2015. JX-

---

tracker. According to the tracker, none of the companies discussed in the HUMs were "under consideration" at the time Bertrand sent them to Brown.[84]

Generally, Court Square did not treat HUMs as super confidential. Court Square executed non-disclosure agreements, or "NDAs" with companies in which it was contemplating an investment, including companies that were the subject of the HUMs sent to Brown.[85] The process by which Court Square entered into and executed NDAs, however, was "informal."[86] There was no system or program tracking which NDAs were in effect and which had expired.[87] The company did not segregate or restrict access to the information received pursuant to the NDAs. They did not destroy or archive the documents after Court Square ceased considering the investment, despite the fact that each NDA required Court Square to do so.[88] There

56 at 1 (Dec 28, 2015 email stating, "we went 'pencils down' [on Rinker] a few weeks ago"); *see also* Moore Dep. Tr. 181:15–182:9 (observing that it would be "rare" for a PE firm to make an investment on information that is "more than a year old"); Trial Tr. at 431:13–17 (Silvestri) (agreeing that Court Square would want the "most up-to-date financial information[]" when making an investment); Delaney Dep. Tr. 156:15–157:7 (same)

[84] JX-100; Trial Tr. at 98:7–22 (Bertrand).

[85] Trial Tr. at 65:14–16 (Bertrand); Trial Tr. at 329:1–9 (Silvestri); JX-22 (Rinker NDA), JX-41 (InterWrap, Inc. NDA), JX-30 (Polynt Group NDA), JX-10 (Distribution International, Inc. NDA), JX-27 (U.S. Pipe NDA), JX-17 (PLZ Aeroscience Corp. NDA), JX-24 (Plaskolite NDA).

[86] Trial Tr. at 65:17–66:1 (Bertrand).

[87] *Id.* at 126:2–13, 132:22–133:7 (Bertrand).

[88] JX-22 § 4.1 (Rinker NDA), JX-41 ¶ 7 (InterWrap, Inc. NDA), JX-30 § 7 (Polynt Group NDA), JX-10 at 2 (Distribution International, Inc. NDA), JX-27 ¶ 5 (U.S. Pipe NDA), JX-17 ¶ 4 (PLZ Aeroscience Corp. NDA), JX-24 at 2 (Plaskolite NDA); Trial Tr. at 137:14–138:2 (Bertrand) ("Q. From your experience at Court Square, did you ever take any action for any of the companies that you worked on that had NDAs to

were so many HUMs "sitting there on Court Square's servers[]" that Silvestri testified that he "didn't even bother trying to count them[.]"[89]

Court Square made no effort to argue that the information contained in the HUMs was non-public or not otherwise known to Brown. Court Square's expert testified that it was "certainly possible" that the information in the HUMs was accessible to Brown through other channels.[90] And Silvestri testified that the financial information found in the HUMs is usually disseminated to many other private equity firms.[91]

---

move any of the confidential information into an archival or backup system for record-retention purposes as opposed to just always being publicly available to the group? A. Not in my time with the firm. There was one shared drive. It was organized by company name, various subfolders. We put everything in there, and after getting a return or destroy notification, we would not, in my experience, distinguish, right, we didn't kind of firewall some information as archived, some as not. It's just all commingled forever."); *see also id.* at 23:8–17 (Lamb) ("During my tenure there, there wasn't really a difference between how the firm stored information on investment opportunities that it had passed on or wasn't considering versus those that it was considering. I think everything was stored on a cloud-based shared drive that the firm -- at least all the investment professionals had access to and it was organized by company or deal so each company or deal had a folder and a bunch of sub-folders containing information that you could access.").

[89] Trial Tr. at 432:8–20 (Silvestri).

[90] *See* Moore Dep. Tr. 301:15–302:19.

[91] *See* Trial Tr. at 429:13–430:15 (Silvestri) ("Q. And so for a company Court Square is interested in purchasing, there could be 100 bidders out there that are interested in purchasing the company in that initial phase. Right? A. That's possible, yes. Q. And the company that is distributing the material, the CIPs that contain confidential information, may go out to a hundred different private equity firms across the world. Right? A. All under an NDA, yes.").

14

### E. Court Square Ceases Payments To Brown.

Beginning in 2019, three years after Brown's departure from Court Square, a handful of employees left Court Square to join MSD. The first was Bertrand, who left Court Square in March 2019.[92] Managing partner John Civantos left shortly after.[93] Steven Lamb,[94] Griffin Naylor,[95] and Dan Ferris,[96] followed around July 2020.

Actively concerned about a mass employee exodus after the July 2020 resignations,[97] Court Square began to craft a legal strategy targeting Brown and the other former employees, who they referred to as "MSD refugees."[98] On August 4, 2020, Court Square managing partner David Thomas sent CFO Anthony Mirra an all-caps email stating: "NEED EXACT DATE OF BROWN'S RESIGNATION. ALSO NEED DEAL LIST WE GAVE HIM."[99] The email included a link to the more-than-three-year-old press release announcing the Hayward transaction and Brown's involvement in that deal.[100]

---

[92] Bertrand Dep. Tr. at 36:17–21; JX-225.

[93] *See* JX-184 at 1–2.

[94] JX-238.

[95] JX-236.

[96] *See id.*

[97] *See, e.g.*, Trial Tr. at 514:23-515:6 (Delaney); JX-235.

[98] JX-390 at 1 (entry for CSCPPriv013) (8/8/20 email from Mirra to Delaney and Court Square's counsel with the subject line: "How is your evaluation of MSD refugees going?").

[99] JX-252.

[100] *Id.*

Court Square's legal strategy led to a letter campaign. On September 4, 2020, Court Square sent a letter to Brown raising a concern that Brown violated the LLC Agreements through the Hayward transaction.[101] Court Square sent a similar letter to Bertrand[102] and became increasingly aggressive in negotiations with Lamb concerning the terms of his departure.[103] The exchanges escalated, and Court Square ultimately ceased making carried interest payments to Brown, Bertrand, and Lamb.[104]

## F. This Litigation

In March 2021, Brown, Bertrand, and Lamb filed this suit asserting claims for breach of the LLC Agreements to enforce their rights to carried interest payments.[105] Lamb and Bertrand both reached settlements with Court Square, leaving Brown as the sole remaining plaintiff.[106]

On May 13, 2021, Court Square asserted counterclaims against Brown, which Court Square amended twice.[107] As amended, Court Square asserts claims for breach of contract (Counterclaim I) and declaratory judgment (Counterclaim II).[108]

---

[101] JX-274.

[102] JX-313.

[103] JX-306; JX-311; JX-312; JX-327.

[104] PTO ¶¶ 50–52; Dkt. 97 ¶ 17 (Amended Answer).

[105] *See* Dkt. 1.

[106] Am. PTO ¶¶ 14, 16.

[107] *See* Dkt. 97 (Second Am. Counterclaims).

[108] *Id.* ¶¶ 95–103.

Brown moved to dismiss Court Square's counterclaims, arguing that Court Square's claims were time-barred or failed to state a claim.[109] The court granted in part, and denied in part, Brown's motion to dismiss Court Square's counterclaims on March 22, 2022.[110] The court held that "any claim seeking relief for Brown's alleged breach of contract before May 13, 2018, is time-barred."[111] The court held a two-day trial on the remaining claims and counterclaims, which concluded on June 1, 2023.[112] The parties completed post-trial briefing and argument on October 27, 2023.

## II.    LEGAL ANALYSIS

Brown claims that Court Square breached the LLC Agreements by withholding carried interest owed to him.[113] Court Square had paid Brown approximately $4.2 million in carried interest since his June 2016 departure from the company.[114] After the letter campaign, however, Court Square withheld $4,134 due to Brown from Fund II[115] and $4,879,192 due to Brown from Fund III.[116] Brown seeks payment of the roughly $4.9 million in withheld amounts, along with damages in the amount of

---

[109] Dkt. 21.

[110] *Brown v. Court Square Cap. Mgmt., L.P.*, 2022 WL 841138, at *6 (Del. Ch. Mar. 22, 2022) [hereinafter "Dismissal Decision"].

[111] *Id.* at *4.

[112] Dkt. 156.

[113] Am. PTO ¶ 2.

[114] *Id.* ¶ 48.

[115] *Id.* ¶ 50.

[116] *Id.* ¶ 51.

17

capital gains plus pre-judgment interest.[117] Brown further seeks an order requiring Court Square to reinstate his interest in the Funds and resume payments owed to him going forward.[118] Defendants counterclaim that Brown breached the Non-Compete Provisions and Confidentiality Provisions of the LLC Agreements. In Defendants' view, these breaches justifying their failure to pay the withheld amounts, entitle them to cease payments going forward, and further entitle them to claw-back payments of carried interest already paid.[119]

A party seeking to enforce a contract must prove each element of its breach of contract claim by a preponderance of the evidence.[120] "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiffs."[121]

Here, however, Defendants admit they ceased payments otherwise due to Brown under the LLC Agreements, and that the breaches identified in the

---

[117] *Id.* ¶ 64.

[118] *Id.*

[119] *Id.* ¶¶ 3, 65.

[120] *Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, 2020 WL 4581674, at *19 n.214 (Del. Ch. Aug. 10, 2020); *Braga Invs. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *8 (Del. Ch. June 8, 2020); *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *36 (Del. Ch. Mar. 30, 2017); *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013); 23 *Williston on Contracts* § 63:14 (4th ed. May 2023 update).

[121] *WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010) (citing *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del.Ch.2003)).

counterclaims are the sole basis to withheld payments. Unless Defendants can prove their counterclaims, therefore, Brown prevails.

Defendants bear the burden of proving each element of the counterclaims by a preponderance of the evidence.[122] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[123]

Under Delaware law, when interpreting a contract, "the role of a court is to effectuate the parties' intent."[124] The court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions,"[125] unless the contract is ambiguous.[126] The court must not read ambiguity into a contract where none exists.[127] "[A] contract is only ambiguous when the provisions in controversy are

---

[122] *See S'holder Rep. Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017) ("To succeed at trial, Plaintiffs, as well as Counterclaim-Plaintiffs, have the burden of proving each element . . . of each of their causes of action against each Defendant or Counterclaim-Defendant, as the case may be, by a preponderance of the evidence." (internal quotation marks and citation omitted)).

[123] *Agilent Techs., Inc v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[124] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[125] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[126] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[127] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) ("[C]reating an ambiguity where none exists could, in effect, create a new contract with rights,

19

reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[128] "[A]mbiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[129] If ambiguity exists, then the court "may consider extrinsic evidence to resolve the ambiguity."[130]

Defendants' counterclaims raise two issues, addressed in turn below: First, did Brown's conduct in connection with Zodiac or Hayward violate the Non-Compete Provisions?[131] Second, did Brown's conduct in connection with the HUMs violate the Confidentiality Provisions?[132]

## A.    Brown Did Not Breach The Non-Compete Provisions.

The Non-Compete Provisions are functionally identical except that the Fund III LLC Agreement includes the phrase "actively considered" before "potential investment" and the Fund III LLC Agreement makes four non-substantive and non-

---

liabilities and duties to which the parties had not assented." (alteration in original) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[128] *Id.* (citing *Rhone–Poulenc Basic Chems. Co.,* 616 A.2d at 1196).

[129] *Id.* (quoting *Rhone–Poulenc Basic Chems. Co.,* 616 A.2d at 1196).

[130] *Salamone*, 106 A.3d at 374 (citation omitted).

[131] Am. PTO ¶¶ 54, 55; Fund II LLC Agr. § 5.14(a); Fund III LLC Agr. § 5.14(a).

[132] Am. PTO ¶ 56; Fund II LLC Agr. §§ 1.6, 5.14(c); Fund III LLC Agr. §§ 1.6, 5.14(c).

relevant alterations.[133] Except for the "actively considered" language (bolded below)

and those minor alterations, both Non-Compete Provisions provide:

> [D]uring the period such Member remains employed by the Company. . . and for a period of one year following such Member's Termination Date, such Member shall not, directly or indirectly through any Person, acquire a direct or indirect interest in any partnership, firm, corporation, business organization, entity or other investment opportunity (each, an "Investment Opportunity") that could reasonably be construed as being **actively considered** as a potential investment in a Portfolio Company and, with respect to the period after such Member becomes a Terminated Member, is set forth on the Deal Sheet that is provided to such Member as soon as practicable after such Member's Termination Date; <u>provided</u>, that if the Deal Sheet is not provided to the Terminated Member within thirty (30) days of his Termination Date, no Investment Opportunity shall be construed as being **actively considered** as a potential investment in a Portfolio Company. Notwithstanding the foregoing, in no event shall this <u>Section 5.14</u> be construed in of itself, as prohibiting a Member from (i) obtaining employment with, or investing in, a fund or any entity involved in similar activities as the Fund, or any such fund or entity investing in entities similar to the Fund so long as such Member otherwise complies with the provisions of this <u>Section 5.14</u>, (ii) making investments in (A) any Existing Fund or (B) any private equity fund, hedge fund or similar investment vehicle so long as such investment is passive and such Member does not have any management rights or investment decision-making authority with respect to such fund or investment vehicle, (iii) making investments in any Investment Opportunity that would otherwise not be prohibited by Section 6.11(a) of the Fund Partnership Agreement and any similar provision contained in the Governing Agreement of any other Person comprising the Fund, or (iv) in the case of William Comfort

---

[133] Fund III LLC Agr. § 5.14(a). The court has found four additional differences between the two provisions, but none are relevant here. Accordingly, the court primarily cites to the Fund III LLC Agreement's Section 5.14(a) but highlights the differences in the parentheticals for clarity.

and Thomas McWilliams, except as may be restricted by Section 6.11(a) of the Fund Partnership Agreement or any similar provisions in the Governing Agreement of any other Person comprising the Fund, engaging in any of the investment or business activities that he is permitted to engage in under Section 5.11. For the purposes of the previous sentence, a Member or Terminated Member shall be deemed to have acquired an indirect interest in an Investment Opportunity if such Member or Terminated Member receives any form of direct or indirect fee, payment or other compensation based on the rendering of investment advice to a third party regarding such Investment Opportunity.[134]

Simplified, the Non-Compete Provisions provide that Brown shall not (i) "acquire an interest" in an (ii) "Investment Opportunity" within the one-year period following his departure from Court Square. It does not categorically prohibit Brown from working for a competitor. Nor does it prohibit Brown from advising a competitor regarding an Investment Opportunity. Rather, the language narrowly defines the prohibited conduct to acquiring an interest (directly or indirectly) in an Investment Opportunity. This narrow definition is consistent with provisions of the LLC Agreements that state that "in no event shall this Section 5.14(a) be construed in of itself, as prohibiting a Member from . . . obtaining employment with, or investing in, a fund or any entity involved in similar activities as" Court Square.[135]

Brown disputes that Zodiac and Hayward were Investment Opportunities for Court Square under the LLC Agreements. And Brown's arguments find strong

---

[134] *Id.*

[135] Fund II LLC Agr. § 5.14(a); Fund III LLC Agr. § 5.14(a) (same but referencing Section 5.14 entirely, not just Section 5.14(a)).

22

support in the factual record, particularly under the "actively considered" language of the Fund III LLC Agreement. But that dispute is secondary.

Even assuming that Zodiac and Hayward were Investment Opportunities, Court Square's claim still fails because Brown did not acquire an interest during the prohibited period, directly or indirectly, in Zodiac or Hayward. Brown received a single form of compensation during the one-year period—his salary and bonus from MSD.[136] Under his employment agreement, Brown would have been paid the same regardless of the number of deals he worked on and regardless of whether they included Zodiac or Hayward.[137] For this reason, Brown did not engage in the prohibited conduct—he did not "acquire an interest" in an Investment Opportunity.

Court Square does not dispute that Brown's only interest in any potential Investment Opportunity—Brown's carried interest related to Hayward—occurred after the prohibited period.[138] Court Square argues, however, that Brown's salary and bonus from MSD constituted an acquired interest because Brown advised MSD on Zodiac and Hayward.[139] Court Square bases this strained interpretation of the LLC Agreements on the contractual definition of "acquire," which includes "receiv[ing] any form of direct or indirect fee, payment or other compensation *based on* the rendering of investment advice to a third party regarding such Investment

---

[136] JX-78 at 1–5; Trial Tr. at 161:3–12, 296:2–8 (Brown).

[137] Dkt. 176 ("Brown's Am. Post-Trial Opening Br.") at 21–22.

[138] Am. PTO ¶ 38.

[139] Court Square's Post-Trial Opening Br. at 32.

Opportunity."[140]  To Court Square, Brown's salary was "based on" rendering investment advice concerning the Investment Opportunities because he was hired "to identify and pursue potential acquisitions" like Zodiac and Hayward.[141]

If Brown's salary or bonus were tied to MSD's successful investment in Zodiac or Hayward, then Court Square's argument might work.  But Court Square did not prove that Brown's salary or bonus were tied to any Investment Opportunity.  Essentially, Court Square interprets the Non-Compete Provisions to preclude Brown from *working on* any Investment Opportunity, regardless of whether he acquired an interest in it.  But that is not what the Non-Compete Provisions say.  Had Court Square desired to prohibit Brown from working on an Investment Opportunity, or from working for a company that pursued an Investment Opportunity, it could have crafted language tailored to prohibit that conduct.  Instead, it narrowly defined the prohibited conduct in terms of an acquired interest.

Moreover, the court's job when confronted with contradictory contractual interpretations is to "adopt the construction that is reasonable and that harmonizes the affected contract provisions."[142]  Court Square's interpretation is discordant with

---

[140] Fund II LLC Agr. § 5.14(a) (emphasis added); Fund III LLC Agr. § 5.14(a) (emphasis added).

[141] Dkt. 173 ("Court Square's Post-Trial Reply Br.") at 9.

[142] *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010) ("Here, the controlling rule of construction is that where a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions." (citations omitted)); *accord Samuel J. Heyman 1981 Continuing Tr. for Lazarus S. Heyman v. Ashland LLC*, 284 A.3d 714,

24

other aspects of the LLC Agreements. Recall that the provisions did not prohibit terminated members from working for a competitor.[143] If salary was included in "payment or other compensation" then former employees would be functionally unable to work for competitors. That is because Brown's Deal Sheet listed approximately 400 companies. As Brown testified, even being prohibited from rendering advice on 100 companies in his vertical would be "incredibly restrictive."[144] Being prohibited from rendering advice for approximately 400 companies spanning all four verticals would certainly restrict him from working for a competitor.[145]

The parties spilled significant ink disputing the meaning of the Non-Compete Provisions and describing parol evidence concerning those provisions,[146] but the court need not consider this evidence. The terms are unambiguous and the plain language

---

721 (Del. 2022) ("Courts should also assure that 'all contract provisions [are] harmonized and given effect where possible." (alteration in original) (quoting *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1225 (Del. 2012)); *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." (quoting *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

[143] Fund II LLC Agr. § 5.14(a) (providing "in no event shall this Section 5.14(a) be construed in of itself, as prohibiting a Member from (1) obtaining employment with, or investing in, a fund or any entity involved in similar activities as" Court Square); Fund III LLC Agr. § 5.14(a) (same but referencing Section 5.14 entirely, not just Section 5.14(a)).

[144] Trial Tr. at 179:2–16 (Brown).

[145] *Id.*

[146] *See, e.g.*, Brown's Am. Post-Trial Opening Br. at 33–36; Court Square's Post-Trial Opening Br. at 38–40.

drives the analysis.[147]  Accordingly, the court finds that Brown's salary and bonus are not included in the definition of acquired interest as set forth in Non-Compete Provisions.  Brown, therefore, did not breach the Non-Compete Provisions.

## B.  Brown Did Not Breach The Confidentiality Provisions.

The facts germane to Court Square's claim that Brown breached the Confidentiality Provisions are not in dispute:  Brown asked Bertrand to share an old HUM to use for formatting.[148]  In response, Bertrand sent seven HUMs that Brown had co-authored for companies no longer on the market or that Court Square was no

---

[147] Based on a footnote in the Dismissal Decision, Court Square went so far as to argue that the court already resolved all of the interpretive disputes in Court Square's favor, but that is not true.  Court Square points to the court's Dismissal Decision and argues that the court's statement—"I have studied the parties respective briefing on these issues and find the defendants' arguments compelling"—constitutes an affirmative finding that cannot be disturbed under the law of the case doctrine.  Court Square's Post-Trial Opening Br. at 34–35.  In the Dismissal Decision, the court found "[a]t the pleading stage," because the "Deal Sheet specifically identified Hayward as a prohibited potential investment[]" that "Hayward could reasonably be construed as a potential investment under the governing agreements."  Dismissal Decision, at *4 n.32. "The law of the case 'is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation.'" *Washington v. Del. Transit Corp.*, 226 A.3d 202, 212 (Del. 2020) (quoting *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990)).  "It is a 'self-imposed restriction that prohibits courts from revisiting issues previously decided, with the intent to promote efficiency, finality, stability and respect for the judicial system.'" *Id.* (quoting *State v. Wright*, 131 A.3d 310, 321 (Del. 2016)).  "The doctrine 'presumes a hearing on the merits and only applies to issues the court actually decided.'"  *Id.* (quoting *Wright*, 131 A.3d at 321).  The deferential standard applied at the pleadings stage has no impact on the court's post-trial factual findings, and thus Court Square's invocation of the law of the case doctrine here is inapplicable.  To the extent Court Square argues the Dismissal Decision found compensation included not just finder's fees, but also salary, that is simply absent from the Dismissal Decision.

[148] Trial Tr. at 94:14–95:22 (Bertrand).

longer considering.[149] Brown forwarded them to an MSD analyst's work email, giving no "thought about the fact that he sent them from his Gmail account."[150]

Both the Confidentiality Provisions provide, as relevant here:

> Each Member and Terminated Member acknowledges and agrees that all Confidential Information is the property of the Company and/or other Covered Persons. Unless the Board otherwise provides its prior written consent, each Member and Terminated Member shall not, and shall not permit such Person's affiliates to, directly or indirectly use, rely on, disclose, divulge, furnish or make accessible to anyone any Confidential Information.[151]

"Confidential Information" is defined in both LLC Agreements as:

> (i) all information, materials or data relating to the Company, the Fund, the Management Company, any Portfolio Company, any of their respective Affiliates and/or any other Person to which any of such Persons has provided management, financial, advisory and/or consulting services (collectively, the 'Covered Persons') that are not generally known to or available for use by the public (including information or materials relating to products or services, pricing structures, accounting and business methods, financial data (including any historical performance data and investment track records), inventions, devices, new developments, methods and processes, prospective investments, customers, clients and investors, customer, client or investor lists, copyrightable works and all technology, trade secrets and other proprietary information) and (ii) any other information, materials or data that any Covered Person is required by law or agreement to keep confidential.[152]

---

[149] *See* JX-106; *supra* n.82.

[150] Trial Tr. at 295:15–20 (Brown).

[151] Fund II LLC Agr. § 5.14(c); Fund III LLC Agr. § 5.14(c).

[152] Fund II LLC Agr. § 1.6; Fund III LLC Agr. § 1.6.

Court Square advances many arguments for why Brown's conduct in connection with the HUMs breach of the Confidentiality Provisions, but its strongest argument relies on the language in the Confidentiality Provisions prohibiting Brown from making accessible information "that [is] not generally known to or available for use by the public."[153]

To be clear, Court Square does not dispute Brown's contention that his sole purpose in seeking and forwarding these documents was to create a formatting template. Court Square does not claim that the formatting of the documents was confidential. And Court Square does not contend that Brown used the information in the HUMs for competitive purposes.

Rather, Court Square argues that the HUMs contained confidential information not generally known to or available for use by the public and that Brown breached the Confidentiality Provisions by requesting and receiving the HUMs.[154] Court Square argues the HUMs contained two types of confidential information: third-party information drawn from confidential information memoranda ("CIMs") received pursuant to NDAs; and Court Square's analyses and conclusions regarding investment opportunities.[155]

Court Square's arguments are of dubious merit for many reasons. For starters, Court Square bears the burden of demonstrating that the information in the HUMs

---

[153] Fund II LLC Agr. § 1.6; Fund III LLC Agr. § 1.6.

[154] Court Square's Post-Trial Opening Br. at 57–63.

[155] *Id.*

was not generally known to or available for use by the public. But the financial information in the HUMs was widely circulated among private-equity firms and would have been easily accessible to anyone in Brown's position.[156] Brown developed the strategies and angles reflected in the HUMs, raising questions as to whether that information was confidential as to Brown.[157] And Court Square did not comb through each of the HUMs to identify the confidential valuation, angles, and strategy purportedly contained therein.

The court does not need to reach the merits of the confidentiality breach claim, however, because Court Square does not argue Brown's breach of the Confidentiality Provisions was material or resulted in any harm to Court Square. Again, Brown used these memos, which he co-authored, containing stale information for companies that were no longer on the market, as templates. Neither MSD nor Brown ever considered investing in the seven HUM companies, and MSD does not retain the HUMs on its servers.[158] If Brown's actions constituted breach, then it was exceptionally minor and did not permit Court Square to abandon performance.[159]

---

[156] *See* Trial Tr. at 429:13–430:15 (Silvestri).

[157] *See* Moore Dep. Tr. at 277:15–279:21.

[158] JX-443, Responses to Questions 2, 3, 6; Trial Tr. 194:16–197:22 (Brown).

[159] *See AB Stable VIII LLC v. Maps Hotels & Resorts One LLC,* 2020 WL 7024929, *101 (Del. Ch. Nov. 30, 2020) (quoting 23 *Williston on Contracts* § 63:3 (4th ed. 2003) (defining partial breach)), *aff'd*, 268 A.3d 198 (Del. 2021).

## III. CONCLUSION

Judgment is entered in favor of Brown. Counsel shall submit a form of order implementing this decision within ten business days.